# Exhibit A

POLICY NUMBER:  BDA - 1035236



The Hanover Insurance Group
*Advantage Portfolio*

# COMMERCIAL CRIME POLICY DECLARATIONS

In Return For The Payment Of The Premium, And Subject To All The Terms And Conditions Of This Policy, We Agree With You To Provide The Insurance As Stated In This Policy.

**Coverage is Written:**

[X] Primary　　[ ] Excess　　[ ] Coindemnity　　[ ] Concurrent

| |
|---|
| Company Name Area:  Massachusetts Bay Insurance Company |
| Producer Name Area:  PRITCHARD & JERDEN, INC. |
| Named Insured: Bit Pay Inc. |
| (Also list any Employee Benefit Plan(s) included as Insureds) |
| Mailing Address: 3423 Piedmont Road N.E., Atlanta, GA  30304 |

| Policy Period |
|---|
| From:  October 27, 2014 |
| To:  Until Cancelled 12:01 A.M. at your mailing address shown above. |

| Insurance Agreements | Limit of Insurance　Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
| 1.  Employee Theft | $ 1,000,000.00 | $ 50,000.00 |
| 2.  Forgery Or Alteration | $ 1,000,000.00 | $ 50,000.00 |
| 3.  Inside The Premises - Theft of Money And Securities | $ 1,000,000.00 | $ 50,000.00 |
| 4.  Inside The Premises - Robbery Or Safe Burglary Of Other Property | $ 1,000,000.00 | $ 50,000.00 |
| 5.  Outside The Premises | $ 1,000,000.00 | $ 50,000.00 |
| 6.  Computer Fraud | $ 1,000,000.00 | $ 50,000.00 |
| 7.  Funds Transfer Fraud | $ 1,000,000.00 | $ 50,000.00 |
| 8.  Money Orders And Counterfeit Money | $ 1,000,000.00 | $ 50,000.00 |

Coverage is provided only if an amount is shown opposite an Insuring Agreement.  If the amount is left blank or "Not Covered" is inserted, such Insuring Agreement and any other reference thereto in this policy is deleted.

If Added by Endorsement:

| Insuring Agreements | Limit of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Endorsements Forming Part Of This Policy When Issued:**

| | | | |
|---|---|---|---|
| CR 20 08 08 07 | CR 25 40 08 07 | CR 25 22 08 07 | CR 20 09 08 07 |
| Manuscript 1 | CR 02 31 10 10 | | CR 20 05 08 07 |

**Cancellation Of Prior Insurance Issued By Us:**
By acceptance of this Policy you give us notice cancelling prior policy Nos. ;
the cancellation to be effective at the time this Policy becomes effective.

**Countersignature of Authorized Representative**

Name:  Frederick H. Eppinger

Title:  President

Signature:

Date:  November 25, 2014

© ISO Properties, Inc., 2001   CR DS 02 08 07

CRIME AND FIDELITY
CR 00 22 05 06

# COMMERCIAL CRIME POLICY
# (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.j.:**

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

### 2. Forgery Or Alteration

a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

   (1) Made or drawn by or drawn upon you; or

   (2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

b. If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises – Theft Of Money And Securities

a. We will pay for loss of "money" and "securities" inside the "premises" or "banking premises":

   (1) Resulting directly from "theft" committed by a person present inside such "premises" or "banking premises"; or

   (2) Resulting directly from disappearance or destruction.

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

a. We will pay for loss of or damage to "other property":

   (1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

   (2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

 © ISO Properties, Inc., 2005

c. We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside The Premises**

a. We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer Fraud**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

a. To a person (other than a "messenger") outside those "premises"; or

b. To a place outside those "premises".

**7. Funds Transfer Fraud**

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**8. Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

a. Money orders issued by any post office, express company or bank that are not paid upon presentation; or

b. "Counterfeit money" that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or Coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

1. This policy does not cover:

a. **Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

(1) You; or

(2) Any of your partners or "members";

whether acting alone or in collusion with other persons.

b. **Acts Of Employees Learned Of By You Prior To The Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this policy and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of that "theft" or dishonest act prior to the Policy Period shown in the Declarations.

c. **Acts Of Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(1) Whether acting alone or in collusion with other persons; or

(2) While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

d. **Confidential Information**

Loss resulting from:

(1) The unauthorized disclosure of your confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

© ISO Properties, Inc., 2005

(2) The unauthorized use or disclosure of confidential information of another person or entity which is held by you including, but not limited to, financial information, personal information, credit card information or similar non-public information.

**e. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**f. Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this policy including, but not limited to, loss resulting from:

(1) Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

(2) Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

(3) Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

**g. Legal Fees, Costs And Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**h. Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**i. Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**j. War And Military Action**

Loss or damage resulting from:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

2. Insuring Agreement **A.1.** does not cover:

**a. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b. Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c. Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not cover:

**a. Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c. Fire**

Loss or damage resulting from fire, however caused, except:

(1) Loss of or damage to "money" and "securities"; and

(2) Loss from damage to a safe or vault.

 © ISO Properties, Inc., 2005

d. **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

e. **Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

f. **Transfer Or Surrender Of Property**

(1) Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

(a) On the basis of unauthorized instructions;

(b) As a result of a threat to do bodily harm to any person;

(c) As a result of a threat to do damage to any property;

(d) As a result of a threat to introduce a denial of service attack into your computer system;

(e) As a result of a threat to introduce a virus or other malicious instruction into your computer system which is designed to damage, destroy or corrupt data or computer programs stored within your computer system;

(f) As a result of a threat to contaminate, pollute or render substandard your products or goods; or

(g) As a result of a threat to disseminate, divulge or utilize:

(i) Your confidential information; or

(ii) Weaknesses in the source code within your computer system.

(2) But, this Exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

(a) Had no knowledge of any threat at the time the conveyance began; or

(b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

g. **Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

h. **Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement **A.6.** does not cover:

a. **Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

b. **Funds Transfer Fraud**

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

c. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

5. Insuring Agreement **A.7.** does not cover:

**COMPUTER FRAUD**

Loss resulting from the use of any computer to fraudulently cause a transfer of "money", "securities" or "other property".

E. **Conditions**

1. **Conditions Applicable To All Insuring Agreements**

a. **Additional Premises Or Employees**

If, while this policy is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this policy. Notice to us of an increase in the number of "premises" or "employees" need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

 © ISO Properties, Inc., 2005 CR 00 22 05 06

**b. Cancellation Of Policy**

(1) The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

(2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    (a) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    (b) 30 days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

**c. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**d. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

(1) This policy;

(2) The property covered under this policy;

(3) Your interest in the property covered under this policy; or

(4) A claim under this policy.

**e. Consolidation – Merger Or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

(1) You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this policy to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this policy shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**f. Cooperation**

You must cooperate with us in all matters pertaining to this policy as stated in its terms and conditions.

**g. Duties In The Event Of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Produce for our examination all pertinent records.

(4) Give us a detailed, sworn proof of loss within 120 days.

(5) Cooperate with us in the investigation and settlement of any claim.

 © ISO Properties, Inc., 2005

**h. Employee Benefit Plans**

(1) The "employee benefit plans" shown in the Declarations (hereafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.**

(2) If any Plan is insured jointly with any other entity under this policy, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(3) With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(4) If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

(5) If two or more Plans are insured under this policy, any payment we make for loss:

(a) Sustained by two or more Plans; or

(b) Of commingled "funds" or "other property" of two or more Plans;

resulting directly from an "occurrence", will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total Limit of Insurance of all Plans sustaining loss.

(6) The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

**i. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the Policy Period shown in the Declarations and up to 3 years afterward.

**j. Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this policy, which is "discovered" by you:

(1) No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(2) No later than 1 year from the date of that cancellation with regard to any "employee benefit plans".

**k. Inspections And Surveys**

(1) We have the right to:

(a) Make inspections and surveys at any time;

(b) Give you reports on the conditions we find; and

(c) Recommend changes.

(2) We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(a) Are safe or healthful; or

(b) Comply with laws, regulations, codes or standards.

(3) Paragraphs **k.(1)** and **k.(2)** apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**l. Joint Insured**

(1) If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this policy. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

 © ISO Properties, Inc., 2005 CR 00 22 05 06

(2) If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this policy, that knowledge is considered knowledge of every Insured.

(3) An "employee" of any Insured is considered to be an "employee" of every Insured.

(4) If this policy or any of its coverages is cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

(a) No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(b) No later than 1 year from the date of that cancellation with regard to any "employee benefit plans".

(5) We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

(6) Payment by us to the first Named Insured for loss sustained by any Insured, other than an "employee benefit plan", shall fully release us on account of such loss.

**m. Legal Action Against Us**

You may not bring any legal action against us involving loss:

(1) Unless you have complied with all the terms of this policy;

(2) Until 90 days after you have filed proof of loss with us; and

(3) Unless brought within 2 years from the date you "discovered" the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**n. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this policy.

**o. Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this policy, our obligations are limited as follows:

(1) **Primary Insurance**

When this policy is written as primary insurance, and:

(a) You have other insurance subject to the same terms and conditions as this policy, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

(b) You have other insurance covering the same loss other than that described in Paragraph **(1)(a)**, we will only pay for the amount of loss that exceeds:

(i) The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

(ii) The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this policy.

(2) **Excess Insurance**

(a) When this policy is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this policy.

(b) However, if loss covered under this policy is subject to a Deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

 © ISO Properties, Inc., 2005

**p. Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease; or

(2) That you hold for others whether or not you are legally liable for the loss of such property.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

**q. Policy Bridge – Discovery Replacing Loss Sustained**

(1) If this policy replaces insurance that provided you with an extended period of time after cancellation in which to discover loss and which did not terminate at the time this policy became effective:

(a) We will not pay for any loss that occurred during the Policy Period of that prior insurance which is "discovered" by you during the extended period to "discover" loss, unless the amount of loss exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, we will pay for the excess loss subject to the terms and conditions of this policy.

(b) However, any payment we make for the excess loss will not be greater than the difference between the Limit of Insurance and Deductible Amount of that prior insurance and the Limit of Insurance shown in the Declarations. We will not apply the Deductible Amount shown in the Declarations to this excess loss.

(2) The Other Insurance Condition **E.1.o.** does not apply to this Condition.

**r. Premiums**

The first Named Insured shown in the Declarations:

(1) Is responsible for the payment of all premiums; and

(2) Will be the payee for any return premiums we pay.

**s. Records**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

**t. Recoveries**

(1) Any recoveries, whether effected before or after any payment under this policy, whether made by us or you, shall be applied net of the expense of such recovery:

(a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;

(b) Second, to us in satisfaction of amounts paid in settlement of your claim;

(c) Third, to you in satisfaction of any Deductible Amount; and

(d) Fourth, to you in satisfaction of any loss not covered under this policy.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

**u. Territory**

This policy covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**v. Transfer Of Your Rights And Duties Under This Policy**

(1) Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

(2) If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**w. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

© ISO Properties, Inc., 2005

**x. Valuation – Settlement**

(1) The value of any loss for purposes of coverage under this policy shall be determined as follows:

(a) Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

(i) At face value in the "money" issued by that country; or

(ii) In the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

(b) Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

(i) Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

i. Market value of the "securities" at the close of business on the day the loss was "discovered"; or

ii. The Limit of Insurance applicable to the "securities".

(c) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

(i) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

(ii) The amount you actually spend that is necessary to repair or replace the lost or damaged property; or

(iii) The Limit of Insurance applicable to the lost or damaged property.

With regard to Paragraphs **x.(1)(c)(i)** through **x.(1)(c)(iii)**, we will not pay on a replacement cost basis for any loss or damage:

i. Until the lost or damaged property is actually repaired or replaced; and

ii. Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(2) We will, at your option, settle loss or damage to property other than "money":

(a) In the "money" of the country in which the loss or damage occurred; or

(b) In the United States of America dollar equivalent of the "money" of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

(3) Any property that we pay for or replace becomes our property.

**2. Conditions Applicable To Insuring Agreement A.1.**

**a. Termination As To Any Employee**

This Insuring Agreement terminates as to any "employee":

(1) As soon as:

(a) You; or

(b) Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition **E.1.u.** for a period of not more than 90 consecutive days.

**3. Conditions Applicable To Insuring Agreement A.2.**

**a. Deductible Amount**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

**b. Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

**c. Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**d. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.u.** does not apply to Insuring Agreement **A.2.**

**4. Conditions Applicable To Insuring Agreements A.4. And A.5.**

**a. Armored Motor Vehicle Companies**

Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

(1) Under your contract with the armored motor vehicle company; and

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**b. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**5. Conditions Applicable To Insuring Agreement A.6.**

**a. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**b. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.u.** does not apply to Insuring Agreement **A.6.**

**F. Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

3. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

4. "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

© ISO Properties, Inc., 2005

"Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this policy.

5. "Employee":

a. "Employee" means:

(1) Any natural person:

(a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any other dishonest act committed by the "employee";

(b) Who you compensate directly by salary, wages or commissions; and

(c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee" as defined in Paragraph **a.(1),** who is on leave; or

(b) To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **a.(2);**

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; and

(b) A director or trustee of yours while that person is engaged in handling "funds" or "other property" of any "employee benefit plan";

(5) Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained as a consultant while performing services for you;

(6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises";

(7) Any "employee" of an entity merged or consolidated with you prior to the effective date of this policy; or

(8) Any of your "managers", directors or trustees while:

(a) Performing acts within the scope of the usual duties of an "employee"; or

(b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

b. "Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **5.a.**

6. "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and which is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

7. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8. "Fraudulent instruction" means:

a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction (other than those described in Insuring Agreement **A.2.**) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means: ·

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

   a. Under Insuring Agreement A.1.:

      (1) An individual act;

      (2) The combined total of all separate acts whether or not related; or

      (3) A series of acts whether or not related;

      committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

   b. Under Insuring Agreement A.2.:

      (1) An individual act;

      (2) The combined total of all separate acts whether or not related; or

      (3) A series of acts whether or not related;

      committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, before such Policy Period or both.

   c. Under All Other Insuring Agreements:

      (1) An individual act or event;

      (2) The combined total of all separate acts or events whether or not related; or

      (3) A series of acts or events whether or not related;

      committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, before such Policy Period or both.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, electronic data or any property specifically excluded under this policy.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

   a. Caused or threatened to cause that person bodily harm; or

   b. Committed an obviously unlawful act witnessed by that person.

18. "Safe burglary" means the unlawful taking of:

   a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

   b. A safe or vault from inside the "premises".

19. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

20. "Theft" means the unlawful taking of property to the deprivation of the Insured.

   © ISO Properties, Inc., 2005

21. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

   a. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

   b. By means of written instructions (other than those described in Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

22. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

© ISO Properties, Inc., 2005

POLICY NUMBER:  BDA - 1035236

**CRIME AND FIDELITY**
**CR 20 09 08 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMEND TERRITORIAL LIMITS

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**SCHEDULE**

| Territory | |
| --- | --- |
| **Add** | **Delete** |
| Worldwide | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

The Territory Condition is amended by adding or deleting the territory shown in the Schedule.

© ISO Properties, Inc., 2006                       □

POLICY NUMBER:  BDA1035236

**CRIME AND FIDELITY**
**CR 20 08 08 07**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CONVERT TO AN AGGREGATE LIMIT OF INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

### SCHEDULE

| |
|---|
| **Policy Aggregate Limit Of Insurance: $1,000,000** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

Paragraph **B. Limit Of Insurance** is replaced by the following:

**B.  Aggregate Limit Of Insurance**

1.  The most we will pay for loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.

2.  The most we will pay in the aggregate for all loss "discovered" during the Policy Period, shown in the Declarations regardless of the number of "occurrences", is the Policy Aggregate Limit of Insurance shown in the Schedule.

3.  The Policy Aggregate Limit of Insurance shall be reduced by the amount of any payment made by us under the terms of this insurance. If the Policy Aggregate Limit of Insurance is exhausted, we will have no further liability to pay for loss which may be "discovered" during the remainder of the Policy Period.

4.  Any recovery made by us after settlement of a loss covered by this insurance shall not be used to increase or reinstate the Policy Aggregate Limit of Insurance.

5.  In the event a loss of "securities" is settled by us through the use of a Lost Securities Bond, such loss shall not reduce the Limit of Insurance unless a payment under such Lost Securities Bond is made and then only for that amount of payment.

© ISO Properties, Inc., 2006

POLICY NUMBER:  BDA1035236

**CRIME AND FIDELITY**
**CR 25 40 08 07**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# INCLUDE EXPENSES INCURRED
# TO ESTABLISH AMOUNT OF COVERED LOSS

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

and applies to the Insuring Agreement(s) designated below:

### SCHEDULE

| X Employee Theft Insuring Agreement | |
|---|---|
| **Costs, Fees Or Other Expenses** | |
| **Limit Of Insurance** | **Covered Loss** |
| $25,000 | |
| ☐ Computer Fraud Insuring Agreement | |
| **Costs, Fees Or Other Expenses** | |
| **Limit Of Insurance** | **Covered Loss** |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following condition is added to Paragraph **E.**
**Conditions:**
1.  We will pay for reasonable costs, fees or other expenses that you incur and pay to an independent accounting, auditing or other service used to determine the amount of loss covered under this insurance.

2.  The most that we will pay for reasonable costs, fees or other expenses is limited to the lesser of the:
    **a.**  Limit of Insurance; or
    **b.**  Percentage of the Covered Loss;
    shown in the Schedule.

**CR 25 40 08 07**                © ISO Properties, Inc., 2006                **Page 1 of 2**

3.  We will pay for reasonable costs, fees or other expenses after settlement of covered loss.

4.  We will have no liability to pay any such costs, fees or other expenses if the amount of the covered loss does not exceed the Deductible Amount of the applicable Insuring Agreement.

5.  The amount that we will pay is part of, not in addition to, the Limit of Insurance for the applicable Insuring Agreement.

6.  Paragraph **(3)** of the **Indirect Loss** Exclusion is replaced by the following:
    Payment of costs, fees or other expenses you incur in establishing the existence of loss under this insurance.

 © ISO Properties, Inc., 2006 CR 25 40 08 07

POLICY NUMBER:  BDA1035236

**CRIME AND FIDELITY**
**CR 25 22 08 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# INCLUDE PERSONAL ACCOUNTS OF SPECIFIED PERSONS

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY

and applies to the Forgery Or Alteration Insuring Agreement:

**SCHEDULE**

| Name Of Person | Limit Of Insurance |
|---|---|
| Executive Management | **$25,000** |
|  |  |
|  |  |
|  |  |
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Each person named in the Schedule is an Insured under the Forgery Or Alteration Insuring Agreement, but only for loss involving covered instruments of that person's personal account and is subject to the Limit of Insurance shown in the Schedule. That Limit of Insurance is part of, not in addition to, the Limit of Insurance shown in the Declarations.

© ISO Properties, Inc., 2006

POLICY NUMBER:  BDA1035236

**CRIME AND FIDELITY**
**CR 20 05 08 07**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# INCLUDE RETROACTIVE DATE

This endorsement modifies insurance provided under the Discovery Form version of the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

### SCHEDULE

| | |
|---|---|
| **Named Insured:** | |
| | Bit Pay, Inc. |
| **Joint Insured(s):** | |
| | |
| **Entity(ies), Assets Or Liabilities:** | |
| | |
| **Retroactive Date:**   12:01 A.M. on: | 10/27/14 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

1. The following is added to Section **E. Conditions:**
   a. **Retroactive Date For Named Insured**
   If the Retroactive Date shown in the Schedule applies to the Named Insured as indicated in the Schedule, the first paragraph of Section **A. – Insuring Agreements** is replaced by the following:
   Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place in its entirety after the Retroactive Date shown in the Schedule which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition.

   b. **Retroactive Date For Joint Insured**
   If the Retroactive Date shown in the Schedule applies to a Joint Insured(s) shown in the Schedule, the first paragraph of Section **A. – Insuring Agreements** shall be deemed amended as respects such Joint Insured(s) as follows:
   Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" involving the Joint Insured(s) shown in the Schedule, taking place in its entirety after the Retroactive Date shown in the Schedule which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition.

 © ISO Properties, Inc., 2006

**c. Retroactive Date For An Entity Acquired Through Consolidation, Merger, Or Acquisition**

If the Retroactive Date shown in the Schedule applies to an entity(ies) shown in the Schedule which is acquired through consolidation, or merger, or in which you purchased or acquired assets or liabilities, the first paragraph of Section **A. – Insuring Agreements** shall be deemed amended as respects such entity(ies) or assets or liabilities, as follows:

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" involving the entity(ies) shown in the Schedule, taking place in its entirety after the Retroactive Date shown in the Schedule which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition.

2. The definition of "occurrence" is replaced by the following:

"Occurrence" means:

   **a.** Under Insuring Agreement **A.1.:**

   **(1)** An individual act;

   **(2)** The combined total of all separate acts whether or not related; or

   **(3)** A series of acts whether or not related; committed by an "employee" acting alone or in collusion with other persons, after the Retroactive Date shown in the Schedule.

   **b.** Under Insuring Agreement **A.2.:**

   **(1)** An individual act;

   **(2)** The combined total of all separate acts whether or not related; or

   **(3)** A series of acts whether or not related; committed by a person acting alone or in collusion with other persons, involving one or more instruments, after the Retroactive Date shown in the Schedule.

   **c.** Under All Other Insuring Agreements:

   **(1)** An individual act or event;

   **(2)** The combined total of all separate acts or events whether or not related; or

   **(3)** A series of acts or events whether or not related;

   committed by a person acting alone or in collusion with other persons, or not committed by any person after the Retroactive Date shown in the Schedule.

© ISO Properties, Inc., 2006   CR 20 05 08 07

POLICY NUMBER   BDA - 1035236                                          CRIME AND FIDELITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## Manuscript 1

This endorsement modifies insurance provided under the following:

   COMMERCIAL CRIME POLICY

---

### BITCOIN DEFINITION AND VALUATION ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   The following is added to the definition of **Money** in Section F, Definitions, of the Conditions and Limitations Section:

   **Money** means:
            (c) or other funds; Bitcoins; or books of account and other records, recorded in writing or in electronic form.

(2)   The following is added to Section x 1.(d) , Valuation:

            (d) Loss of Bitcoin(s) covered under this Policy, the Company may, at its sole discretion,

      (i)   Purchase replacement Bitcoin(s)  or tender the value of the Bitcoin(s) in **Money** of the United States of America.

      (ii)   Tender the value of the Bitcoins in **Money** of the United States America, such value shall be determined by taking the weighted average of the values of Bitcoins in such **Money** as posted on the three largest Bitcoin exchanges (by number of Bitcoins traded), as of 12:00 PM Eastern Time on the day the loss is discovered.

All other terms, conditions and limitations of this Policy shall remain unchanged.

CRIME AND FIDELITY
CR 02 31 10 10

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
GOVERNMENT EMPLOYEE THEFT AND FORGERY POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

**A.** Paragraph **(1)** of the **Cancellation Of Policy** Condition is replaced by the following:

    **(1)** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

        **(a)** If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

        **(b)** If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency or other third party, we will mail or deliver at least 10 days' notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

        Our notice will state the effective date of cancellation, which will be the later of the following:

            **(i)** 10 days from the date of mailing or delivering our notice; or

            **(ii)** The effective date of cancellation stated in the first Named Insured's notice to us.

**B.** Paragraph **(5)** of the **Cancellation Of Policy** Condition is replaced by the following:

    **(5) Premium Refund**

        **(a)** If this policy is cancelled, we will send the first Named Insured any premium refund due.

        **(b)** If we cancel, the refund will be pro rata, except as provided in Paragraph **B.(5)(c)**.

        **(c)** If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

        **(d)** If the first Named Insured cancels, the refund may be less than pro rata.

        **(e)** The cancellation will be effective even if we have not made or offered a refund.

**C.** The following is added to the **Cancellation Of Policy** Condition:

    **(7)** If we decide to:

        **(a)** Cancel or nonrenew this policy; or

        **(b)** Increase current policy premium by more than 15% (other than any increase due to change in risk, exposure or experience modification or resulting from an audit of auditable coverages); or

 © Insurance Services Office, Inc., 2009

**(c)** Change any policy provision which would limit or restrict coverage;

Then:

We will mail or deliver notice of our action (including the dollar amount of any increase in renewal premium of more than 15%) to the first Named Insured, if any, at the last mailing address known to us. We will mail or deliver notice at least:

**(i)** 10 days before the effective date of cancellation if this policy has been in effect less than 60 days or if we cancel for nonpayment of premium;

**(ii)** 45 days before the effective date of cancellation if this policy has been in effect 60 or more days and we cancel for a reason other than nonpayment of premium; or

**(iii)** 45 days before the expiration date of this policy if we decide to nonrenew, increase the premium or limit or restrict coverage.

**D.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following:

**Concealment, Misrepresentation Or Fraud**

We will not pay for any loss or damage in any case of:

**1.** Concealment or misrepresentation of a material fact; or

**2.** Fraud;

committed by you or any other insured, at any time, and relating to coverage under this policy.

 © Insurance Services Office, Inc., 2009 □

POLICY NO: BDA-1035236
INSURED:   BIT PAY INC.

**CRIME AND FIDELITY**
**CR 20 01 08 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGE
# (DISCOVERY FORM)

This endorsement modifies insurance provided under the Discovery Form version of the following:

    COMMERCIAL CRIME COVERAGE FORM
    COMMERCIAL CRIME POLICY
    EMPLOYEE THEFT AND FORGERY POLICY
    GOVERNMENT CRIME COVERAGE FORM
    GOVERNMENT CRIME POLICY

**SCHEDULE**

| Change Number | Date Of Issue | Effective Date Of Change |
|---|---|---|
| 1 | 12/12/2014 | 12:01 A.M. on: 10/27/2014 |

**The Named Insured is changed to:**

**The following Insured(s) is added as a Named Insured:**

**The following Insured(s) is deleted as a Named Insured:**

**The Mailing Address is changed to:**

**The Policy Period is:**

     **Extended to:**              **Reduced to:**

**The following Insuring Agreement(s) is:**

    **X**  Added to the Coverage Form/Policy

| Insuring Agreement(s) | Limit Of Insurance | Deductible Amount |
|---|---|---|
| 9.  Destruction of Electronic Data | $ 1,000,000 | $ 50,000 |
|  | $ | $ |

[ ] Deleted from the Coverage Form/Policy

| Insuring Agreement(s) | Limit Of Insurance | Deductible Amount |
|---|---|---|
| | $ | $ |
| | $ | $ |

[ ] Changed as respects the Limit(s) of Insurance and/or Deductible Amount(s)

| Insuring Agreement(s) | Limit Of Insurance | Deductible Amount |
|---|---|---|
| | $ | $ |
| | $ | $ |

The following Endorsement(s) is:

[X] Added to the Coverage Form/Policy

| Endorsement(s) | Limit Of Insurance |
|---|---|
| CR 04 13 05 06 Destruction of Electronic Data or Computer Programs | $   1,000,000 |
| | $ |

[ ] Deleted from the Coverage Form/Policy

| Endorsement(s) | Limit Of Insurance |
|---|---|
| | $ |
| | $ |

[ ] Changed as respects the Limit(s) of Insurance

| Endorsement(s) | Limit Of Insurance |
|---|---|
| | $ |
| | $ |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

 © ISO Properties, Inc., 2006 CR 20 01 08 07   □

Application of changes affected by this Endorsement:

**1. All Changes Other Than In Paragraph 2.**

This change applies to loss or damage that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you on or after the Effective Date of Change. However, if a retroactive date endorsement is used, the provisions of that endorsement are controlling.

**2. Deletion Of Coverage**

This change applies to loss or damage that you sustain resulting directly from an "occurrence" taking place:

**a.** On or after the Effective Date of Change which is "discovered" by you after the Effective Date of change; and also

**b.** Before the Effective Date of Change if "discovered" by you after 60 days from that date.

| Accepted: |
| --- |

_____

First Named Insured

_____

Title

_____

Date

CRIME AND FIDELITY
CR 04 13 05 06

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESTRUCTION OF ELECTRONIC DATA OR COMPUTER PROGRAMS

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

## PROVISIONS

With regard to this Destruction Of Electronic Data Or Computer Programs Endorsement, the provisions of the coverage form or policy to which this endorsement is attached apply, unless modified by this endorsement.

**A.** The following insuring agreement is added to Section **A. Insuring Agreements:**

We will pay for costs that you incur to restore or replace damaged or destroyed "electronic data" or "computer programs" stored within your "computer system" resulting directly from:

**1.** A virus designed to damage or destroy "electronic data" or "computer programs"; or

**2.** Vandalism by a person who has gained unauthorized access to your "computer system";

including reasonable costs that you incur to restore your "computer system" to the level of operational capability that existed before the virus or vandalism occurred.

**B.** Under Section **D. Exclusions:**

**1.** The following exclusions do not apply to this Insuring Agreement:

**a.** The Acts Of Employees, Managers, Directors, Trustees Or Representatives Exclusion in the Commercial Crime Coverage Form and Commercial Crime Policy; and

**b.** The Acts Of Officials, Employees Or Representatives Exclusion in the Government Crime Coverage Form and Government Crime Policy.

**2.** The following exclusions are added:

This Insuring Agreement does not cover:

**a.** Loss resulting from the fraudulent preparation or input of "electronic data" or "computer programs".

**b.** Loss resulting from errors or omissions in the design of "computer programs".

**c.** Loss resulting from errors or omissions in the programming or processing of "electronic data".

**C.** The following definitions are added to Section **F. Definitions:**

**1.** "Computer programs" means a set of related electronic instructions which direct the operations and functions of a computer or devices connected to it which enable the computer or devices to receive, process, store, retrieve or send "electronic data".

**2.** "Computer system" means:

**a.** Computers and related peripheral components;

**b.** Systems and applications software;

**c.** Terminal devices; and

**d.** Related communications networks;

by which "electronic data" is received, processed, stored, retrieved or sent.

**3.** "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment.

© ISO Properties, Inc., 2005

**4.** "Occurrence" means:

    **a.** As respects Paragraph **A.1.,** all covered costs incurred by you between the time the damage or destruction is discovered and the time your "computer system" is restored to the level of operational capability that existed before the virus occurred. Recurrence of the same virus after your "computer system" has been restored shall constitute a separate occurrence.

    **b.** As respects Paragraph **A.2.:**

        **(1)** An individual act or event;

        **(2)** The combined total of all separate acts or events whether or not related; or

        **(3)** A series of acts or events whether or not related;

        committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, before such Policy Period or both.

© ISO Properties, Inc., 2005

# Exhibit B



June 8, 2015

Bryan Krohn
Chief Financial Officer
Bitpay, Inc.
3423 Piedmont Road NE
Atlanta, GA 30304

Re:   Insured:      Bitpay, Inc.
      Policy No.:   BDA-1035236
      Claim No.:    00-00034587
      Claim:        December 11-12, 2014 Bitcoin Transfers

Dear Mr. Krohn:

Hanover Insurance Company ("Hanover") has completed its investigation into Bitpay's claim under Hanover Policy No. BDA-1035236 (the "Policy") for recovery of losses totaling $1.8 million resulting from Bitpay's transfer of 5000 bitcoins on three separate transactions to what appeared to be Second Market, a Bitpay customer. The transactions were triggered by fraudulent email instructions purporting to be to/from you. For the reason stated below, Hanover is unable to afford coverage based on the information and documentation received to date.

Hanover's Policy provides coverage for Computer Fraud and reads as follows:

> 6. Computer Fraud
>
> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
> a.   To a person (other than a "messenger") outside those "premises"; or
> b.   To a place outside those "premises".

Hanover's Policy includes an Endorsement, which reads in part as follows:

BITCOIN DEFINITION AND VALUATION ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1) The following is added to the definition of **Money** in Section F, Definitions, of the Conditions and



Limitations Section:

**Money** means:

> (c) or other funds, Bitcoins; or books of account and other records, recorded in writing or in electronic form.

The Policy provides coverage with limits of $1,000,000.00 ($50,000 deductible) for Computer Fraud under Insuring Clause 6.

### The Bitpay Chain of Events:

**1** - On or before December 11, 2014, the email account of David Bailey was compromised by an unknown third party. Bitpay was in negotiations with Mr. Bailey, of ybitcoin, to purchase BitPay's magazine business.

**2.** – On December 11, 2014, Bitpay, including Bryan Krohn, receives what appears to be a legitimate email from Mr. Bailey to review modifications to an attached Google document. Mr. Bailey was unaware of this email. Upon Mr. Krohn opening his Google docs account his Google account password and authentication codes were compromised.

**3** – Immediately after clicking on the Google doc link, Mr. Krohn enters his authenticating information as prompted in order to access the purported Google docs and receives an error message. He believes his private information was stolen at that time and that his response provided access to his email to the fraudster. He also believes that the fraudster at that time was able to review his communications to learn specific details about how Bitpay transacted business, including the fact that Second Market was the sole purchaser of bitcoins with whom Bitpay did not require advance payment.

**4** – On December 11, 2014 at 2:26 PM, an email purporting to be from Mr. Krohn is sent to Stephen Pair ("the CEO"), which contains a purported email chain between the Mr. Krohn and Mr. Preston Blankenship, of Second Market, which the CEO believes to be authentic. The email requests that 1,000 bitcoins be transferred to Second Market at a specific wallet address provided. At 3:33 PM the bitcoins are sent from Bitpay's hot wallet.

**5** – On December 11, 2014 at 4:23 PM, someone posing as Mr. Krohn sends another email to the CEO which says, "just confirmed with Tony [Gallippi], please send Second Market another 1,000 btc to the same address…"

**6** – The CEO responds to the second email at 4:29 PM stating, "I don't have that many in the hot wallet…these will draw down the warm wallet."

**7** – Also at 4:29 PM, in response to the email from the CEO, Mr. Gallippi responds, "No, I will send from Bitstamp."

**8** – At 4:30 PM, the CEO responds "ok."



**9** – At 4:35 PM, Mr. Gallippi states that Bitstamp should be sending shortly, and apparently Bitstamp consummated the transfer.

**10** – At 9:20 AM the next day, the imposter, posing as Mr. Krohn, sends another email to the CEO stating, "please send 3000 btc to Second Market" at a different Blockchain internet wallet address.

**11** – The CEO then sent an email directly to Mr. Krohn to confirm that this request, which exceeded the usual 1000-2000 daily bitcoin amount between the companies, was valid.

**12** – The imposter sends an email back to the CEO, with a purported cc to Second Market, that the 3,000 bitcoin request is valid.

**13** – The CEO sends the 3,000 bitcoins from Bitpay's warm wallet to Second Market.

**14** – The CEO then sends an email back to Mr. Krohn's address, with a cc to Ms. Gina Guarnaccia at Second Market, confirming that the bitcoins have been sent. Ms. Guarnaccia responds that she did not send the prior email noting the 3,000 bitcoins and address for them to be sent, and that Second Market did not purchase the bitcoins.

As noted in Insuring Agreement 6 cited above, the Policy requires that the loss of money be the direct result of the use of any computer to fraudulently cause a transfer of that property from inside the premises to a person or place outside the premises. "Direct" means without any intervening step i.e. without any intruding or diverting factor. The Computer Fraud Insuring Agreement is only triggered by situations where an unauthorized user hacks into or gains unauthorized access into your computer system and uses that access to fraudulently cause a transfer of Money to an outside person or place. The facts as presented do not support a direct loss since there was not a hacking or unauthorized entry into Bitpay's computer system fraudulently causing a transfer of Money. Instead, the computer system of David Bailey, Bitpay's business partner, was compromised resulting in fictitious emails being received by Bitpay. The Policy does not afford coverage for indirect losses caused by a hacking into the computer system of someone other than the insured.

Furthermore, there is an important distinction between fraudulently causing a transfer, as the Policy language requires, and causing a fraudulent transfer, which is what occurred upon the CEO's approval of the bitcoin transactions after receiving the fictitious emails. The loss incurred by Bitpay was not a direct loss. The Insuring Agreement is also not triggered when an authorized system user triggers a transfer, even one induced by fraud. In this case, the transfers were first required to be approved by Bitpay's CEO, who is an authorized user of the system. The fact that the transfer requests were allegedly fraudulent does not, for the reasons explained above, trigger the Computer Fraud Insuring Agreement.



In addition, the term "premises" is defined in the Policy as, "the interior of that portion of any building you occupy in conducting your business". It is Hanover's understanding that the bitcoins were held online, and transferred online, and are not on the physical premises of Bitpay. It does not appear that the bitcoin transactions involved a transfer of property from inside the premises to outside the premises. As such, Hanover must respectfully decline to provide coverage for this loss under the Computer Fraud Insuring Agreement.

Because the reasons discussed above are dispositive of our coverage analysis, we have not discussed other terms, conditions or limitations of the Policy that might apply to this matter. Our action in this regard is not, and should not be interpreted as, a waiver of any additional rights Hanover may have to decline coverage for this matter. Rather, Hanover reserves all rights available to it under the Policy, at law or in equity.

Our analysis is also necessarily based on the facts and information made available to us to date. If you have additional information that would bear on our analysis, please forward it to us immediately. We will gladly review our coverage position in light of any additional information received. Naturally, we reserve the right to raise additional terms and conditions of the Policy, or to assert other rights we may have under the law or in equity, that may become apparent upon review of such additional information.

If you have any questions you may contact me weekdays from 7:00 a.m. to 3:30 p.m. at 630-760-3464.

Sincerely,

Ginger Johnson
Specialty Claim Analyst
The Hanover Insurance Company
A member of The Hanover Insurance Group

Exhibit C



**Morris,
Manning &
Martin, LLP**

June 15, 2015

Jessica F. Pardi
404-504-7662
jfp@mmmlaw.com
www.mmmlaw.com

**VIA EMAIL AND U.S. MAIL**

Ms. Ginger Johnson
Specialty Claim Analyst
The Hanover Insurance Group
P.O. Box 15148
Worcester, MA 01615-0148
gjohnson@hanover.com

| | Re: | **Insured:** | **Bitpay, Inc. ("Bitpay")** |
|---|---|---|---|
| | | **Insurer:** | **Massachusetts Bay Insurance Company ("MBIC")** |
| | | **Policy No.:** | **BDA-1035236 (the "Policy")** |
| | | **MBIC Claim No.:** | **00-00034587 (the "Claim")** |

Dear Ms. Johnson:

This firm represents Bitpay, the insured under the Policy. On December 15, 2014, Bitpay notified MBIC of the Claim which involves loss resulting directly from three fraudulent transfers of bitcoins from Bitpay to an unauthorized recipient who hacked into Bitpay's computers (all three transfers collectively referred to as the "Transfers"). The loss occurred when a hacker infiltrated the computer of Bryan Krohn, the CFO of Bitpay, and sent false authorizations (seemingly from Mr. Krohn) which caused the Transfers. After notifying MBIC of the Claim, Bitpay provided all information requested by MBIC and cooperated fully with MBIC's investigation of the Claim.

One June 8, 2015, six months after Bitpay notified MBIC of the Claim, MBIC emailed a letter to Pritchard & Jerden ("P&J") denying the Claim (the "Denial"). MBIC contends the Claim is not covered under the Policy because (1) the loss is not the direct result of the use of any computer to fraudulently cause a transfer; and (2) the bitcoins were not transferred from inside the Bitpay premises to outside the Bitpay premises (the "Premises Requirements"). Both of these grounds are without merit, and the Denial must be withdrawn for at least the following four (4) reasons:

1. Bitpay has suffered a "direct loss";

2. The Transfers and loss resulted directly from computer fraud;

3. The Premises Requirements are inapplicable to bitcoin; and

4. The cases relied upon by MBIC support Bitpay's demand for coverage.

Ms. Ginger Johnson
June 15, 2015
Page 2

Each of these reasons is discussed in detail below.

### 1.    Bitpay Has Suffered a "Direct Loss."

The loss suffered by Bitpay is a "direct loss" of money (*i.e.*, bitcoins) and therefore covered under the Policy.  MBIC misinterprets the Computer Fraud provision of the Policy which reads as follows:

### 6.  Computer Fraud

We will pay for loss of or damage to "money," "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

a.  To a person (other than a "messenger") outside those "premises"; or

b.  To a place outside those "premises."

(Policy, Insuring Agr. 6 (the "Computer Fraud Provision")).  Contrary to MBIC's contention that "directly" should be interpreted to exclude intervening causation, as opposed to describing the type of loss, the requirement of "directly" modifies the *type of loss* therefore requiring a "direct loss" as opposed to an "indirect loss."    Indeed, indirect losses are excluded under Policy Exclusion (f) (Indirect Loss).  Bitpay's loss is a direct financial loss covered under the Policy as opposed to the consequential losses excluded under the Policy (*e.g.* lost income).

Bitpay's interpretation of the Computer Fraud Provision is in accordance with the relevant case law, including the *CB&T* case relied upon by MBIC.  In *CB&T*, the Court analyzed coverage under a fidelity bond which covered "'loss resulting directly from' employee dishonesty and excluded both 'indirect or consequential losses' and lost 'potential income, including but not limited to interest and dividends, not realized by the Insured'." *CB&T*, 2007 WL 4973847 at *1.  The *CB&T* Court held that "directly" described the *type* of loss and not the *cause* of the loss. *Id.* at *4.

Bitpay has suffered a "direct loss" covered under the Policy, and MBIC must pay the Claim immediately.

### 2.    The Transfers and Loss Resulted Directly From Computer Fraud.

Even assuming *arguendo* that "directly" in the Computer Fraud Provision requires direct *causation* as opposed to direct *loss*, Bitpay still is entitled to coverage for the Claim under the

Ms. Ginger Johnson
June 15, 2015
Page 3

Computer Fraud Provision. The hacker illegally entered Bryan Krohn's computer[1] and then used his or her computer to send false authorizations to fraudulently cause the Transfers. The Computer Fraud Provision does not require a "fraudulent transfer." It requires only that the transfer is fraudulently caused; *e.g.*, by a fraudulent authorization. MBIC's argument that the direct cause of the Transfers was legitimate actions by Bitpay is without merit and contrary to the requirements of the Computer Fraud Provision.

Even the authorities relied upon by MBIC (discussed in further detail in Section 4 herein), comport with Bitpay's interpretation. In *Pestmaster*, the court held that "'Computer Fraud' occurs when someone 'hacks' or obtains unauthorized access or entry to a computer in order to make an unauthorized transfer *or otherwise uses a computer to fraudulently cause a transfer of funds*'." *Pestmaster*, 2014 U.S. Dist. LEXIS at *19 (emphasis added). Accordingly, the *Pestmaster* court found that "Computer Fraud" exists whether the hacker actually makes the transfer **or** the hacker causes the transfer (*e.g.*, via fraudulent authorization).

The Transfers and loss resulted directly from computer fraud and are covered under the Computer Fraud Provision.

### 3. The Premises Requirements are Inapplicable to Bitcoin.

In the Denial, MBIC contends that because the bitcoins at issue "were held online, and transferred online, and are not on the physical premises of Bitpay" there is no coverage for the Claim because subsection (b) of the Computer Fraud Provision requires transfer of bitcoins from inside Bitpay's premises to outside of Bitpay's premises.

MBIC agreed to add bitcoin to the Policy definition of "money" thereby insuring Bitpay against loss of bitcoin. Unlike traditional money, bitcoin does not exist in physical form in any location or premises, and it cannot be transferred from or to any physical location. Accordingly, any agreement to insure bitcoin that purportedly requires bitcoin to be on Bitpay's premises is illusory, and MBIC's interpretation is meritless and evidences bad faith.

The Premises Requirement does not apply to the Claim, and Bitpay is entitled to coverage under the Policy and immediate payment of the Claim.

### 4. The Cases Relied Upon by MBIC Support Bitpay's Demand for Coverage.

While not cited in the Denial, we understand based upon MBIC's communications with P&J that MBIC believes the following cases support the Denial:

---

[1] The Denial implies the only computer hacked was that of David Bailey and therefore no Bitpay computer was hacked. This is incorrect.

Ms. Ginger Johnson
June 15, 2015
Page 4

1. *Pestmaster Svcs., Inc. v. Travelers Cas. and Surety Co. of Am.*, 2014 U.S. Dist. LEXIS 108416 (C.D. Cal.) ("*Pestmaster*"); and

2. *Citizens Bank & Trust Co. v St. Paul Mercury Ins. Co.*, 2007 WL 4973847 (S.D. Ga. ("*CB&T*").

*CB&T* fails to support the Denial for the reasons stated in Section 1 herein.

The facts of *Pestmaster* could not be more different from the instant Claim. In *Pestmaster*, the insured intended to transfer the funds to the recipient, a payroll company engaged by the insured. It was only after the legitimate transfer of the funds that the payroll company decided to use the money for its own purposes as opposed to paying the required payroll taxes of the insured. The fraud at issue in *Pestmaster* had no relation whatsoever to the transfer of the funds. Moreover, the holding of *Pestmaster* mandates MBIC cover the Claim as discussed in Section 2 above.

MBIC's argument regarding a purported difference between "fraudulently causing a transfer" and "causing a fraudulent transfer" is unpersuasive. By hacking into Bryan Krohn's computer, the hacker affected and/or caused the Transfers. The occurrences discussed in dicta in *Pestmaster* differ from the instant Claim because they do not involve any computer hacking whatsoever but instead involve receipt of fraudulent information (*e.g.*, insurance claim information) via other means. Finally, the insured in *Pestmaster* sought lost profits and consequential damages which were excluded under the relevant policy. As discussed in Section 1 herein, Bitpay seeks only direct losses.

For each of the reasons stated herein, the Denial must be rescinded and the Claim paid immediately by MBIC. Please confirm coverage for the Claim and issue payment to Bitpay no later than June 25, 2015. If you wish to discuss the Denial and/or Bitpay's demand for payment further, please contact me directly.

Sincerely,

MORRIS, MANNING & MARTIN, LLP

Jessica F. Pardi

cc:   Mr. Bryan Krohn
      Mr. Chad McGee

9501387 v2

# Exhibit D



SUITE 3600
1 N. LASALLE ST.
CHICAGO, IL 60602
~
MICHIGAN OFFICE
P.O. BOX 87
HARBERT, MI 49115

**Michael J. Weber**
Email: mweber@leoweber.com

TELEPHONE: (312) 857-0910
FACSIMILE: (312) 857-1240
WWW.LEOWEBER.COM

Also Admitted in Michigan

July 10, 2015

**SENT AS ATTACHMENT TO EMAIL**

Jessica F. Pardi
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Rd., NE
Atlanta, GA 30326

Re:  Insured:       Bitpay, Inc.
     Policy No.:    BDA-1035236
     Claim No.:     00-00034587
     Claim:         Computer Fraud

Dear Jessica:

Following up to my letter of June 24th, we have reviewed your letter of June 15th. While we appreciate that the virtual buying and selling of bitcoins is unique in comparison to standard monetary methods, Hanover stands on its position set forth in its letter of June 8th.

Bitpay's claim is submitted under Hanover's Commercial Crime Policy, a 2005 ISO Form, Bond No. BDA-1035236 effective October 27, 2014 through October 27, 2015. Insuring Clause 6 of the Policy provides coverage for Computer Fraud and reads as follows:

> 6. Computer Fraud
>
> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
> a.      To a person (other than a "messenger") outside those "premises"; or
> b.      To a place outside those "premises".

Hanover's Policy includes an Endorsement, which reads in part as follows:

BITCOIN DEFINITION AND VALUATION ENDORSEMENT

# LEO & WEBER, P.C.

Jessica Pardi
July 10, 2015
Page 2

In consideration of the premium charged, it is agreed that:

(1) The following is added to the definition of **Money** in Section F, Definitions, of the Conditions and Limitations Section:

**Money** means:

(c) or other funds, Bitcoins; or books of account and other records, recorded in writing or in electronic form.

The Policy provides coverage with limits of $1,000,000.00 ($50,000 deductible) for Computer Fraud under Insuring Clause 6.

Hanover disagrees with your interpretation of the term, "resulting directly from" in Insuring Clause 6 and your application of the direct loss causation standard to the indirect loss exclusion (f). The direct loss standard in Insuring Clause 6 is distinguished from the indirect loss exclusion you refer to in your letter. The requirement of a direct loss is unambiguous. "Direct" means without any intervening agency or step: without any intruding or diverting factor. *Pinnacle Processing Group, Inc. v. Hartford Cas. Ins. Co.*, 2011 WL 5299557, at *5-6 (W.D.Wash. 2011).

Georgia is one of a majority of states that applies the stricter, "direct-means-direct" standard. While we were unable to find a Georgia case that squarely addresses the direct loss requirement in the context of a computer fraud, we refer you to *Citizens Bank & Trust Company v. St. Paul Mercury Insurance Co.*, 2007 WL 4973847 (S.D. Georgia 2007), solely for its interpretation that "[l]oss resulting directly from" language was unambiguous, and that "direct" means "direct." citing *Vons Companies, Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 492 (9th Cir. 2000). The *Citizens Bank* decision applies the direct loss standard and is cited in leading federal cases discussing the causation issue throughout the country, most notably, in *Tooling, Mfg. and Technologies Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665 (6th Cir. 2012). We are cognizant that the *Citizens Bank* decision ultimately turned on the application of the indirect loss exclusion to lost interest and not the direct loss causation standard.

In *Tooling Mfg.*, as in several other cases which have adopted the direct means direct standard, the Court referred to both the Webster's Dictionary and Black's Law Dictionary definition of "directly" and "direct" as follows:

*Webster's* defines "directly" as:

1a: without any intervening space or time: next in order....

3: in close relational proximity ...[;]

4a: without any intervening agency or instrumentality or determining influence: without any intermediate step....

# LEO & WEBER, P.C.

Jessica Pardi
July 10, 2015
Page 3

*Black's Law Dictionary* defines "directly" as:

> In a direct way without anything intervening; not by secondary, but by direct, means.

*Black's* further defines "direct" as:

> Immediate; by the shortest course; without circuity; operating by an immediate connection or relation, Instead of operating through a medium; the opposite of indirect...

> Without any intervening medium, agency or influence; unconditional.

The primary word used to describe "directly" in each of these definitions is "immediate," and each of the dictionaries defines "directly" or "direct" as "without anything intervening" or "without any intervening space or time ... agency or instrumentality." Thus, the *Tooling Mfg.,* court held that the Policy covers the insured only for "loss of or damage to 'money', 'securities' and 'other property' which results [immediately and without any intervening space, time, agency, or instrumentality] from 'theft' by an 'employee."

In *Brightpoint, Inc. v. Zurich American Insurance Co.,* No. 1:04-CV-2085-SEB-JPG, 2006 WL 693377 (S.D. IN March 10, 2006), the court adopted a "direct means direct" reading of computer fraud coverage and held that there was no "direct loss" to the insured. In *Brightpoint,* the insured was in the business of selling pre-paid telephone calling cards. It purchased a policy with Zurich which contained "Computer Fraud/Wire Transfer" coverage as follows:

> We will pay for loss of, and loss from damage to, Covered Property RESULTING DIRECTLY FROM THE Covered Cause of Loss.

> 1. Covered Property: "Money", "Securities" and "Property Other Than Money and Securities".

> 2. Covered Cause of Loss: "Computer Fraud".

The *Brightpoint* court assumed, for purposes of its analysis, that the initial facsimile sent by the fraudster to the insured was an initiating cause of the fraud. The court declined to rule on whether the facsimile should be considered computer fraud, and noted that including facsimiles in the definition of computer fraud coverage, as the word "computer" is ordinarily used and understood in our society is a stretched interpretation.

On summary judgment, Zurich argued that the initial receipt of the facsimile was not the direct cause of Brightpoint's loss. Brightpoint argued in favor of a more proximate cause standard

# LEO & WEBER, P.C.

Jessica Pardi
July 10, 2015
Page 4

by arguing that the receipt of the facsimile, "caused it to take actions which eventually led to it being defrauded when it released the phone cards to the defrauding party."

In denying coverage, the court held as follows – the language quoted below being the most relevant to the Bitpay scenario:

> Brightpoint argues that the policy only requires that the theft follow and be directly related to the use of a computer. It maintains that the policy language does not contain a modifier such as "proximate cause", "predominate cause" or the like. In addition, according to Brightpoint, all that is required in terms of coverage is the use of a computer followed by a theft that is in some way connected to the use of the computer. We think Brightpoint's expansive interpretation of the term "directly related" represents a distortion of the policy terms.

Thus, the court denied coverage, even assuming the fraud was initiated by what the policy defined to be "computer fraud" (the facsimile), on grounds that intervening steps were the actual direct cause of the loss.

It is our understanding that the email account of David Bailey, Editor-in-Chief of yBitcoin, was compromised by an unknown perpetrator. It is believed that this allowed the perpetrator to review the content of Mr. Bailey's email account that contained communications with several entities including Bitpay. In December 2014 an email purportedly from David Bailey was sent to several recipients including Brian Krohn and Tony Gallippi. The email requested that the recipients respond and comment on a document entitled, "New Rates Deferred Advertising [BCM]". When the recipients clicked on the link in the email they were prompted to provide their Google account credentials to access the document. By clicking on the link, the recipients were directed to a site controlled by the perpetrator. The perpetrator was then able to capture the credentials of those individuals who provided them. Brian Krohn was one of those recipients who provided his credentials. The perpetrator then logged onto Mr. Krohn's Google email account and sent fictitious emails to Tony Gallippi and Stephen Pair, requesting their approval to sell bitcoins to one of their customers, Second Market.

Mr. Krohn was deceived by the email purportedly from David Bailey, which resulted in Mr. Krohn providing his Google credentials to the perpetrator. This is commonly referred to as a, "spear phishing" email scheme. While the spear phishing email appears to be from a trusted source, in actuality the sole purpose is to obtain confidential information. This scheme allowed the perpetrator to obtain Mr. Krohn's Google email account with the credentials Mr. Krohn provided. The perpetrator was then able to access a computer system maintained by Google, which provides hosting services for Mr. Krohn's Google account. We are unaware of any evidence to support that the perpetrator gained access to the Bitpay computer system or device. The ultimate transfer of bitcoins did not result from the perpetrator's access to the Bitpay computer system or device. Ultimately Mr. Krohn's superiors made the decision to send bitcoins in three separate transactions, prior to receiving payment, to whom they believed was Second Market. Without receiving payment in advance or

# LEO & WEBER, P.C.

Jessica Pardi
July 10, 2015
Page 5

contemporaneously with the transfer of the bitcoins, Bitpay would have suffered the same loss had the request for bitcoins come in by fictitious fax, letter or means other than a computer email. Arguably the loss began with an unauthorized entry into David Bailey's system and was not directly caused simply because a computer had been used in the scheme. Computer fraud equates to the use of a computer to "fraudulently cause a transfer" and is not the use of a computer somewhere in a transaction that involves fraud, false pretenses or misrepresentations.

In *Pestmaster Services, Inc. v. Travelers Cas. and Sur. Co.*, 2014 WL 3844627 (C.D. California 2014), the insured company, Pestmaster, engaged a third-party payroll service, Priority 1, and expressly authorized, through an ACH Authorization, Priority 1 to enter into its computer system and bank accounts for the purpose of handling its payroll tax obligations to the IRS. When payroll was approved by Pestmaster, Priority 1 would then access Pestmaster's bank account and transfer the approved amount of payroll taxes to Priority 1's account. Typically, the funds would be transferred on a Friday and sit in the Priority 1's account for several days until paid to the IRS on a Wednesday. Over a period of nearly a year, Priority one failed to send the funds to the IRS and instead diverted the funds to its own purposes.

The Computer Crime Insuring Agreement (Coverage F) in *Pestmaster* contained similar language to that of the Bitpay Policy. The Central District of California, a, "direct means direct" jurisdiction, denied coverage under the computer fraud provision. The court stated:

> "Computer Fraud" occurs when someone "hacks" or obtains unauthorized access or entry to a computer in order to make an unauthorized transfer or otherwise uses a computer to fraudulently cause a transfer of funds. In this case, Pestmaster urges the Court to adopt an interpretation of this language to mean that any use of a computer to cause a fraudulent transfer of Money, Securities, or Other Property rather than the "use of a computer to fraudulently cause" such a transfer is sufficient for coverage under the Policy.

> However, there is an important distinction between "fraudulently causing a transfer," as "Computer Fraud" is described in the Policy, and Pestmaster's interpretation of "Computer Fraud" as "causing a fraudulent transfer." This distinction was recognized in *Universal American Corp. v. National Union*, 38 Misc.3d 859, 959 N.Y.S.2d 849 (New York 2013), *aff'd*, 110 A.D.3d 434, 972 N.Y.S.2d 241 (2013), where the court ruled that there was no computer fraud coverage when an authorized person entered fraudulent data into a computer system. The Court explained that the computer fraud coverage only applied to the "unauthorized entry into the system, *i.e.,* by an unauthorized user, such as a hacker, for unauthorized data, *e.g.,* a computer virus.

The Computer Fraud Insuring Agreement is only triggered by situations where an unauthorized user hacks into or gains unauthorized access into Bitpay's computer system and uses that access to fraudulently cause a transfer of Money to an outside person or place. The facts as presented do not support a direct loss since there was not a hacking or unauthorized entry into

# LEO & WEBER, P.C.

Jessica Pardi
July 10, 2015
Page 6

Bitpay's computer system fraudulently causing a transfer of Money. Instead, the computer system of David Bailey, Bitpay's customer, was compromised resulting in fictitious emails being received by Bitpay upon Mr. Krohn providing his Google credentials. The Policy does not afford coverage for indirect losses caused by a hacking into the insured's customer's computer system.

The term "premises" is defined in the Policy as, "the interior of that portion of any building you occupy in conducting your business". Hanover appreciates that the endorsement to the Policy includes bitcoins in the definition of money and there are no case decisions specifically addressing coverage issues arising from the use of a computer fraudulently causing a transfer of bitcoins. That does not, however, alleviate the need for Bitpay to meet each of the elements required to afford coverage. It is our understanding that the bitcoins are stored in digital wallets. Transactions are recorded in a public distributed ledger called the blockchain. The transactions are anonymous and recorded only in the form of the wallets to which the bitcoins flowed. The identification of the individuals or entity generating the transactions is not known – whether that be transactions within a common entity or to outside sources. The definition in the Policy focuses on location of the property (interior of the insured's building – more of a bricks and mortar approach), more so than control or ownership of the property. In that regard, the question becomes whether or not the insured's "wallet" which is stored online including on a third party website exchange, falls within the definition of "in premises".

Hanover continues to reserve all rights available to it under the Policy, in law, by contract, statute, in equity or otherwise. If you want to discuss this matter further, please do not hesitate to contact me.

Sincerely yours,

LEO & WEBER, P.C.

By: Michael X. Weber